PAN AMERICAN BANK OF ORLANDO,
N.A., a national banking
association, Plaintiff,

v.

DOLLAR LAND CORPORATION, LTD.,
(U.S.), a New York corporation,
Defendant.

PAN AMERICAN BANK OF ORLANDO,
N.A., a national banking
corporation, Plaintiff,

v.

Leonard MARX, an individual; Brook Re-
alty Co., Inc., a corporation; Brook
Shopping Centers, Inc., a corporation;
and Marx Realty & Improvement Co.,
Inc., a corporation, Defendants.

Nos. 75–145–Orl–Civ–Y, 78–40–Orl–Civ–Y.

United States District Court,
M.D. Florida,
Orlando Division.

March 1, 1982.

On Motion for Reconsideration and
for Clarification June 21, 1982.

Charles R. Fawcett, Orlando, Fla., G. Morton Good, Miami, Fla., for Pan American Bank.

Doug B. Beattie, Lee J. Colling, Orlando, Fla., for Brook Shopping Centers.

A.J. Stanton, Orlando, Fla., for Dollar Land Corp., Ltd.

## OPINION

GEORGE C. YOUNG, Senior District Judge.

This controversy arises from a dispute of the meaning of certain provisions contained in the lease agreement of May 20, 1965, entered into between the plaintiff, the then Citizens National Bank, now the Pan American Bank of Orlando, and the firm of Collins Tuttle,[1] which was a real estate development firm. The issues in controversy are essentially:

1. The amount of annual basic rent, and
2. The amount, if any, of escalated rent each year.

In 1964 Collins Tuttle and Clarence Gay on behalf of the bank (Clarence Gay being the President and guiding hand of the bank) entered into an agreement whereby the bank would sell to Collins Tuttle the property which the bank then owned and occupied on the southwest corner of Orange and Robinson Streets and in addition would convey to Collins Tuttle by assignment certain long term leases which the bank acquired on adjoining properties. In addition to paying for the bank building then in existence, hereinafter referred to as the existing building, Collins Tuttle agreed to erect a modern high-rise office building of approximately fifteen or sixteen stories and that the bank would agree to occupy the first, second and third floors.

On May 20, 1965, when the lease agreement was signed, the property was conveyed to Collins Tuttle and thereafter the bank was a tenant of Collins Tuttle.

The provision for basic rental in paragraph 2 on Page 2 of the lease for the existing bank structure comprising approximately 27,000 sq. ft. commencing from the date of closing of title was the sum of $121,500. per annum. There is controversy over whether the bank should pay $121,500 per annum because it is now contended and has been contended since approximately 1967 that there was less than 27,000 sq. ft. in the then existing building. So, because it is contended that the rental was affixed on a basis of $4.50 per sq. ft., $121,500 is in excess by the amount that 27,000 sq. ft. exceeds the actual dimensions of the existing building multiplied by $4.50.

There is no dispute that there is somewhat less than 27,000 sq. ft. in that building. As previously noted, the building belonged to the bank. Collins Tuttle purchased the building on the representation of Mr. Gay that it had approximately 27,000 sq. ft.

Plaintiff's counsel correctly pointed out that the deed for the property contained no reference to the square footage in the building; rather the description was by the legal description of the property. But as between the bank and the purchaser, which became the landlord, the bank was in a better position to know the square footage and presumably sold the building on the basis of how many square feet it had in it, but objects to paying rent on that same approximate square footage.

---

1. Collins Tuttle and Company, Inc., a Delaware corporation.

However, paragraph 2 of the lease provides a base rent for the existing building on the basis of approximately 27,000 sq. ft. and provides a base rent of $121,500, but then paragraph 2 also provides that when the tower is completed and the bank occupies the space in the tower that then there will be a base rental for both the existing building and the space occupied in the tower of $221,778.50, with no reference to square footage.

To complicate the problem, paragraph 2 also sets forth that the rent above provided shall be paid in equal monthly installments and states further that it is computed on a basis of $4.50 per sq. ft. of office space and $1.50 a foot per sq. ft. for basement or storage space.

If that were all in the lease on this subject it would have been even more difficult to resolve the issue of basic rent, but on page 26 of the lease in the second paragraph on that page it is stated clearly:

"It is the intention and agreement of the parties that, upon completion of the new office building, the annual base rent for the existing bank structure and the new office building will be a minimum of $221,278.50."

After the execution of the lease on May 20, 1965, as might be expected, Collins Tuttle secured a construction loan from the Chase Manhatten Bank in New York City and then a permanent loan from the New York Life Insurance Company. The commitments for the loans contained as conditions the existence of various leases including one from the bank with a minimum rental lease payment of $221,278.50.

Mr. Gay and his attorney, Mr. George Johnson, did dispute the obligation of the bank to pay for the 27,000 sq. ft. and there were negotiations back and forth as how to resolve this controversy. The landlord did not want to reduce the rent as a means of resolving the dispute, because that could have caused problems with the mortgagee. So, several possible methods for resolution were considered, one, a rental back by Collins Tuttle for $5,000 so as to give $5,000 to the bank. That was never firmly set forth in a written agreement but evidence established that such an oral agreement was made between Mr. Gay and a Mr. Tankoos.

Collins Tuttle, after the completion of the building, conveyed the property (50% interest in it initially and ultimately the entire interest) to Dollar Land Company, one of the defendants here—a subsidiary of County Dollar Corporation. Mr. Tankoos was an officer in that corporation and in December, 1967, negotiated an agreement with Mr. Gay whereby the then existing annual electrical charge of $11,772 would be reduced by $5,000 so as to compensate for what was considered by the bank to be an excess rental for the existing building.

Mr. Gay later, and the bank in this case, contended that the reduction to $6,772 (which represented the $5,000 reduction from $11,772) was a permanent agreement whereby there would be no further escalation of the electrical charges. That, of course, is in conflict with the lease agreement, which specifically provides for electrical charge escalation in the event that the cost increases during the term of the lease and there are various options that the landlord has for escalating the charges.

Then on September 4, 1970, (which is three years after the agreement for the $5,000 reduction) the bank and landlord agreed to increase the electrical charge from the $6,772 figure to $8,464.95 annually. The September 4, 1970 agreement is significant in two ways. One, it refers to the reduced figure of $6,771.96. It says:

"Whereas, initially the parties agreed upon an estimated cost of annual electrical energy charge of $6,771.96, and

Whereas, the landlord has determined that it is now necessary to increase the estimated annual charged tenant for said electrical energy . . ."

It goes on to provide for the increase to $8,464.95.

So, it recognized the figure that was set by the oral agreement of Mr. Tankoos and Mr. Gay in December of 1967, because the actual original figure that was being paid prior to that time was $11,772 per year. As

noted above, the $5,000 credit was the guise by which the basic rent on the building was reduced without the knowledge of the mortgagee, Chase Manhatten Bank.

It is significant in a second way in that it shows that the parties did not intend that the $6,772 figure as an electrical annual charge would be permanent and could never be increased because it in fact was increased by that agreement and even states that that sum represents the estimated cost of annual electrical energy charge consumed in the premises occupied by the tenant.

"It is understood that this agreement does not release, alter or waive the language of paragraph 4(e) of said lease but merely sets forth the annual estimated electrical energy charge, which said charge may be changed from time to time as provided for in said lease."

So that the electrical charges were not fixed either at $564.33 per month or annually at $6,772.00 nor were they fixed in perpetuity at $8,464.95. What was fixed was that the bank should get a credit of $5,000 permanently.

In 1967 Gay and Tankoos also agreed on the annual rental to be $244,266.64 and this Court in its Order of August 3, 1970 held:

"The Court finds the basic annual rental due from the plaintiff to the defendant landlord to be the amount of $244,226.64 as agreed upon by Mr. Gay and Mr. Tankoos in 1967. This amount has been paid by the bank, albeit oft times under protest, for every year since the Gay-Tankoos agreement. Of course, in 1976, and the years following, the bank deducted from its basic rental payments certain amounts being paid directly by the bank for electricity. In addition, the bank withheld an amount representing rent for space on the third floor of the new tower building which the bank erroneously attempted to lease-back to the landlord.

In looking at the evidence which forms a basis for the Gay-Tankoos agreement, the amount arrived upon therein as the figure for basic rent is in line with the actual square footage measurements.

The Court finds that the total annual figure of $244,266.64 may be broken down as follows: $121,500.00 as the contractually (written lease) agreed minimum for the existing building (27,000 sq. ft. at $4.50/sq. ft.), plus $4,500.00 for storage space (3,000 sq. ft. at $1.50/sq. ft.), leaving $118,226.64 rental for the new building which at $4.50/sq. ft. would compute out to 26,272.58 sq. ft. Looking to the various engineering measurements of the actual square footage of the new building, the figure of 26,272.58 sq. ft. is so close to the engineer's totals, that it is reasonable to conclude that Gay and Tankoos arrived at a logical and fair compromise of the dispute. This should remain binding upon the parties for the remainder of the lease agreement period for the base rent.

The actual square footage of the buildings is not without significance in the case, however, even though its calculation is not necessary to determine the amount of basic annual rental due. Square footage is necessary to compute the percentage of escalation rent to be paid by the bank as set forth in subparagraph 3–A(d) of the lease. With respect to the new building the measurements of James Stokes are to be used, as stipulated to by the parties in these cases. Mr. Stokes arrived at a figure of 25,872.83 sq. ft. as the total amount of net rentable space being occupied by the bank in the new building. Mr. Stokes further arrived at the figure of 7,020.68 sq. ft. for the amount of total net rentable space on the third floor of the new building, which floor is considered to be a typical floor for determining the total amount of net rental space in the entire new tower building.

The question remains, however, what figure should be used for purposes of rent escalation for the existing building. This figure is very important because, the Court finds from the evidence presented that the available accounting records of the landlord do not appear to specifically break down costs between those incurred for the sole benefit of the existing build-

ing and those incurred in connection with the new building. In the future the landlord's records must accurately separate these costs to reflect actual expenses for one building or the other. For example, window repairs or plumbing repairs could be specifically allocated to one building or the other if proper records were kept. On the other hand, items such as parking lot repairs, janitorial service, and gardening expenses necessary to maintain the grounds around the buildings would not appear to be specifically attributable to one building or the other.

In the case of the latter expenses (as well as the former expenses in the past when separate records are not available), the accountants in this case have testified that some arbitrary allocation method must be used. The evidence from the accountants indicates that the appropriate method customarily used to allocate the expenses of operating rental property is one based on the amount of rentable floor space. This is logical. The greater the amount of space that is being used, then the greater will be the amount of light, heat, cleaning, etc. required to maintain the space in proper operation.

The defendant landlord contends that the figure of 27,000 sq. ft. as recited in the lease, should be considered the area of the existing building for rent escalation purposes. The plaintiff bank, on the other hand, argues that the actual square footage in the existing building should be used for computing rent escalation.

The Court recognizes that the purposes of the rent escalation provisions in the lease are to protect the landlord from the effects of inflation and unanticipated increases in particular costs of operation over the course of the long-term lease. As noted above, a larger building may reasonably be expected to incur proportionately greater increased costs of operation than a smaller building. If the accounting allocation of costs is to be done on the basis of square footage, then the most accurate result can only be obtained by use of an exact measurement of the actual square footage involved.

To use the figure of 27,000 sq. ft. for the existing building, as the landlord contends, would distort the amount of escalation rent payable by the bank. The bank is the sole tenant in the existing building and must bear 100% of the increased costs allocated to that building. The actual square footage in the existing building is significantly less than 27,000 sq. ft. Use of the 27,000 sq. ft. figure would impose upon the bank the burden of bearing a greater amount of the total escalation bill for both buildings than would ordinarily be expected when using the neutral accounting principles discussed above.

The Court finds therefore that for purposes of calculating escalation rent—as opposed to basic rent, which is a fixed amount for the term of the lease—the landlord must use the actual square footage of the existing bank building for all calculations. This includes the calculation necessary to determine the percentage to be inserted in sub-paragraph 3–A(d) of the lease."

Subparagraph (d) of paragraph 3–A of the lease pertains to the rent escalation for the new office building, and the sentence which is in controversy is that which reads:

"Except for the items in sub-paragraph (e) following, the portion of the increase or decrease to be reflected in escalation shall be _____%."

In parenthesis at the end of the paragraph there is in small print:

"Percentage above referred to is to be inserted upon the execution of this lease."

That is the standard form apparently used in the Collins Tuttle leases—in the Dollar Land Company leases and the various other leases.

■ Unfortunately, the percentage figure that was to be inserted in the blank in subparagraph (d) of paragraph 3–A was never inserted. The evidence disclosed that Wolf R. Charney, an attorney for Collins Tuttle, on January 16, 1967 wrote to George Johnson, attorney for the bank, requesting the insertion of a percentage figure in the amount of 39.428% (Pltf's Ex. 13). The

record is unclear as to why no percentage figure was ever inserted in the original lease. Clarence Gay, President of the Bank, died before this litigation and George Johnson, according to his deposition was not aware of whether a figure had been inserted or not. This Court finds that it was the intention of the parties to insert a figure and that it was intended that the percentage should be that the enumerator would be the net rentable area leased to the bank in the new building and the denominator would be the total net rentable area in the new building.

At the commencement of this Opinion the Court noted that one of the issues in controversy was "the amount, *if any,* of escalated rent each year." The plaintiff bank vigorously has contended throughout this litigation that it is not obligated to pay any escalated rent because of the failure to fill in the percentage figure in paragraph 3–A(d) and the failure to insert figures in 3–E and because the landlord has allegedly failed "to keep books and records reflecting direct operating costs of the existing bank structure and of the new office building in accordance with a standard method of accounting recognized and approved for maintaining accounts of office buildings". This Court has already resolved the issue concerning the failure to fill in the percentage in paragraph 3–A(d). Likewise, the failure to fill in the blanks in paragraph 3–E must be resolved in favor of the defendant landlord. That paragraph reads as follows:

"The amount of the operating costs for the base years less taxes and as adjusted for both the existing bank structure and the new office building, and the amount of the taxes for the base years with respect to both the existing bank structure and the new office building shall be inserted at this point and the signatures of the parties or their agents, affixed:

Operating costs of the existing bank structure during base year . . . . . . . . . . . . . $
Operating costs of the new office building during base year . . . . . . . . . . . . . . . . . . . . . $
Taxes for base year on existing bank structure . . . . . . . . . . . . . . . . . . . . . . . . . . $
Taxes for base year on new office building $ ·        "

It is obvious that the blanks in paragraph 3–E could not be filled in until the lease had been operative for at least one year. The evidence in this case has revealed that the controversy of escalated rents commenced soon after occupancy by the bank of the premises and that the disagreement inevitably lead to this litigation. Unquestionably there was a meeting of the minds that a figure should be inserted in each of the blanks and the failure to arrive at the exact amounts should not act to relieve the plaintiff bank from any obligation to pay escalated rent.

The contentions that the landlord failed to keep appropriate books and records reflecting direct operating costs was considered by the Magistrate in the proceedings before him.

In an effort to expedite this case the Court referred this case to the Magistrate for the taking of evidence and a Report and Recommendation on the issue as to which items and amounts of claimed escalation were objected to by the bank. Although the Magistrate undertook and completed his assigned task with dispatch, it developed that the assignment merely afforded the parties additional opportunity to prolong this litigation. The bank vehemently attacked the Magistrate's findings, his recommendations and his impartiality. The latter contention was, of course, most serious and required this Court to read the entire transcript of the proceedings before the Magistrate, which consisted of 2,004 pages. After reading the transcript, this Court held hearings on the objections, the last of which recessed on December 11, 1981.

The main general objection of the bank to landlord's claim was that the cost figures for each year—1968 through 1977—as set forth in defendant's Exhibit 75 were based on annual audits by the accounting firm of Davis Berdon and Company. Plaintiff's counsel contended that Exhibit 75 was not a summary admissible under the Federal Rules of Evidence and that the landlord should have been required to produce all the original invoices to support his claim for rent escalation.

Mr. Harold Silver, certified public accountant and auditing manager of the Berdon firm, testified that he had been involved in the annual audits of the Dollar Land Corporation, the owner of the Pan American Bank Building from 1962 through 1968. He described the audit procedure as follows (Tr. 43–44):

"The starting point for our audit is the general ledger of the company. The general ledger consists of two types of accounts, balance sheet accounts and income and expense accounts. The balance sheet accounts would reflect the balances as of the end of the year for receivables, cash, payables and capital and equity accounts. The income and expense accounts would be summaries of the year-to-date activity for all of the income received as well as all of the expenses paid. These summaries in the general ledger were posted. The information was obtained from the monthly management statements which may have been posted to the general ledger either monthly or quarterly or even annually. These management statements are summaries of all of the disbursements made by the managing agent for each month. These disbursements are then summarized by similar accounts for each month and then those accounts are then carried forward to the general ledger. So the monthly management statement contains all the individual disbursements for each month as well as summaries by the account caption for each month, and those are posted by a bookkeeper to the general ledger accounts.

The monthly summaries, management summaries are itemization of all the checks paid out, and those checks are in payment of all the underlying invoices which are maintained in their files."

Counsel for the bank sought to discredit landlord's claim because the audits did not ascertain that each and every item was properly posted to the general ledger. Mr. Good (counsel for the bank) asked of witness Silver (Tr. 0323):

"Are you saying that in your opinion as a CPA, that each of those dollars set forth in column one are in your opinion, as a CPA, accurate and properly posted to the proper account, is that what you're saying? Are you swearing to this Court that in your opinion each one of those figures to the penny is an accurate statement of dollars posted to the proper accounts?"

Silver explained (Tr. 0319):

"We performed tests of the postings to assert that items that were indicated to have been posted to a particular account were, in fact, posted."

The Magistrate found that the claim of the defendant landlord as set forth in Defendant's Exhibit 75 was proved by the testimony of Mr. Silver and other supporting evidence subject to modifications he directed. The record fully supports the Magistrate's finding on this point to the extent that such expenditures in the amounts claimed were actually made.

■ Accordingly, this Court concludes that despite the failure of the landlord and his predecessor to maintain records in complete compliance with the lease and to timely present its annual demands for escalation to the bank, the books and records which it did keep were sufficient to reflect expenditures claimed to be direct operating costs of the existing bank structure and of the new office building in accordance with a standard method of accounting recognized and approved for maintaining accounts for office buildings. This is not a finding, however, that all the expenditures claimed by defendant were in fact direct operating costs, or even if in the category of direct operating costs, that the defendant in all instances proved the exact amount of such expenditures attributable to operating costs. Furthermore, although the landlord should have kept its books and records so as to reflect a division of the direct operating costs between the existing building and the new structure, the failure to do so should not be fatal to a fair and reasonable resolution of the escalation issue. As previously noted herein, this Court has directed the landlord to keep its costs separated between

the buildings in the future in strict compliance with the lease agreement, but this Court agrees with the Magistrate that it is possible to arrive at the escalation figure for past years on the basis of the books and records which were kept by the landlord and its predecessor.

The Magistrate found that even though the lease provided for 1966 to be the base year for future escalation, that 1968 was appropriate as the base year because (1) it was the first full year of occupancy by the bank of both the new and existing buildings, and (2) there was an absence of reliable information for costs in the prior years. The findings on this issue were amply supported by the record and were in accord with previous holdings by this Court prior to the reference to the Magistrate.

■ Another general objection by the bank to defendant's claim was to defendant's "grossing-up" certain categories to 100 percent occupancy for determining escalation figures. The "grossing-up" resulted from the second sentence of section (d) of paragraph 3–A of the lease which reads:

"In the event part of the building is unoccupied during the base year or any subsequent calendar year the direct operating costs shall be adjusted so as to reflect the direct operating costs of the building as though fully occupied and the increase or decrease in rent shall be based upon such adjusted cost."

In reference to that language, witness Silver explained (Tr. 0208–0210):

A. "For example, if the building were only 50 percent occupied in the base year and no adjustments were made for this, and the following year the building were [sic] a hundred percent occupied, the cost would necessarily be very low in the first year and be substantially increased in the second year, and the tenant would be obligated then to pay a percentage of a very large dollar increase.

So, naturally, as the building gets more fully occupied the expenses increase.

If the building were fully occupied then no adjustment would be necessary.

Q. Now, when you use the term grossed up, would you put that in layman's language for us? I assume you are going to be using it again.

A. Going back to the average occupancy percentage schedule, which was the third page of this exhibit, I determined at line 32, column six, that the average occupancy for 1968 was seventy six point two eight percent.

Dividing that into one hundred percent gives me a hundred thirty one point one percent, so that certain items which were to be increased would be increased by thirty one percent as an adjustment so as to arrive at one hundred thirty one percent of that number.

Not all costs would increase as the building became more fully occupied, but only certain costs.

THE COURT: How did you determine the—

THE WITNESS: I made an initial determination as to which costs would be increased, and then with the assistance of Mr. Pat Dunne of Feist & Feist it was determined how to apply this particular percentage.

In other words, for example, office cleaning, the cost of cleaning the remaining vacant space of the building would increase in direct proportion to the costs already incurred.

In other words, it cost 20 cents to clean a certain percent of the building. It would still cost you another 20 cents a square foot for the remaining portion of the building.

Other expenses would increase on a similar proportion in the building. Some expenses would not increase.

Insurance, for example, would not increase if there were additional occupancy."

The Magistrate found this "grossing-up" procedure to be appropriate and this Court agrees. In fact, the procedure is for the benefit of the tenant.

The Magistrate found the bank's objections to the inclusion of the expenses of the Magruder Garage and to rents paid to the City of Orlando for parking spaces to be without merit. This Court disagrees; in the opinion of this Court the record fails to establish that the defendant carried its burden of proving that these expense items were intended by the parties to be covered by the escalation provisions.

The Magistrate in holding the plaintiff's objection to the garage expenses to be invalid, apparently adopted the defendants' reliance on defendants' Exhibits numbered 83, 84, 85 and, in particular, Exhibit No. 86. Defendants' Exhibits 83 and 84 were merely covering letters wherein counsel for the landlord forwarded to the attorneys for the bank the amendment to the lease agreement and certain other documents. Defense Exhibit 85 was a copy of an amendment dated March 7, 1966, between Collins Tuttle and the bank, providing that in lieu of the requirement that Collins Tuttle construct a three or four story parking structure accommodating approximately 130 cars, that Collins Tuttle could provide parking space for approximately 130 cars in the Magruder Garage and in open-air parking spaces on premises adjacent to the bank buildings.

Defendant's Exhibit No. 86 was a certification by the bank executed to induce the Chase Manhatten Bank to make a construction loan on the Collins Tuttle premises occupied by the existing bank structure and the structure to be constructed by Collins Tuttle. Exhibit 86 certified that the lease was in full force and effect and that Collins Tuttle was not in default and that there had been no amendments or modifications to the lease agreement except as to the substitution of the Magruder Garage and open-air parking for the requirement in the original lease for the erection of a three or four story parking structure.

The Magistrate's Report and Recommendation fails to explain his reliance on the aforesaid exhibits or why he concluded that the expenses of the garage and the costs of maintaining the open-air parking were direct operating costs within the contemplation of the escalation provisions. Examination of the transcript of the proceedings before the Magistrate and in particular Pages 1588 thru 1609, discloses that counsel for the plaintiff bank were unduly hampered by objections from counsel for the defendant landlord (which objections were in the opinion of this Court erroneously sustained) in counsel's efforts to adduce evidence as to the landlord's use of the garage and open-air parking spaces. There was evidence, however, that the garage did provide on occasion, parking spaces for persons other than tenants of the landlord and that persons were able to park in the garage and open-air spaces merely on the representation that they were visiting a tenant in the bank building, regardless of whether such tenant was the bank or one of the non-bank tenants.

While sustaining the landlord's contention that the Magruder spaces and the open-air parking space expenses were direct operating costs, the Magistrate refused the alternative contentions of the bank that revenue from parking should have been taken into consideration and that the square footage should have been taken into consideration also.

While the lease agreement provided for a parking facility, there was nothing in the escalation provisions, either as to the existing structure or the one to be constructed which would indicate an intention of the parties that the operating costs in connection with parking would be taken into consideration in computing escalation rent. Accordingly, the expenses claimed by the landlord in connection with the Magruder garage and the open-air parking spaces are not allowed as direct operating costs for the purposes of computing escalation rent.

■ The bank objects to the inclusion in the landlord's claim of "Professional fees". The record reveals that initially the landlord sought to include in its escalation rent claim fees paid to attorneys and to accountants for annual audits. After the bank's examination of the claim and the specific objections raised in the Arthur Anderson

exhibit (Pltf's # 92) as introduced through plaintiff's witness Nelson, the landlord deleted from this particular item amounts paid to attorneys. The audit fees were for audits not only of the Orlando buildings, but buildings in other locations. The landlord in its final claim (as set forth in defendants' Exhibit # 75) arbitrarily cut in half the amounts paid to auditors. The Magistrate finds this allocation to be reasonable. The bank not only objects to the arbitrary allocation of one-half of the audit fees, but also to the inclusion of this item in any amount as a direct operating cost. Examination of the record has caused this Court to conclude that there was not substantial evidence from which the Magistrate could find that the amounts paid to the auditors were direct operating costs as contemplated by the lease. Accordingly, the expenses claimed by the landlord in connection with "Professional fees" for each of the years in question are not allowed as direct operating costs for the purposes of computing escalation rent.

■ The bank also objects to the inclusion by the landlord of expenses in connection with "Management Commissions". These expenses were incurred in connection with payment to management firms for management of the Orlando buildings. Once again, the record fails to reveal substantial evidence to support the Magistrate's finding that this item was a direct operating cost contemplated by the lease. Accordingly, the expenses claimed by the landlord in connection with "Management Commissions" are not allowed as direct operating costs for the purposes of computing escalation rent.

■ The bank objects to an item claimed by the landlord as having been incurred in the year 1977 for alleged flooring repairs in the amount of $2,807.47. The evidence was that $173.36 of that amount was for a new carpet in Suite 710 and that $2,634.11 of that amount was for a new carpet in Suite 1000. These items should not have been included as direct operating costs for which the defendants would be proportionately charged. Accordingly, the $2,807.47 claimed as "flooring repairs" in 1977 should be deleted from the amounts allowed as expenses in computing direct operating costs for 1977.

In all other respects, the findings of the Magistrate are supported by substantial evidence and affirmed.

■ As stated earlier herein, counsel for the bank claimed that the Magistrate was prejudiced and requested the Court's scrutiny of the entire record, which as also previously noted, this Court has done in great detail. By actual count, counsel for both parties objected before the Magistrate at least 837 times and the arguments in connection with those objections substantially exceeded 1,000 pages of the transcript of the proceedings. Despite the local rule to the contrary, all four counsel (two for each party) participated in examination and cross-examination of witnesses and arguments on objections. No doubt the Magistrate did understandably on several occasions indicate a loss of patience. Also, he did make rulings which with the benefit of hindsight appear to have been on occasion erroneous. But error alone does not constitute bias or prejudice. Although, as indicated by this Court's rulings set forth above, this Court does not agree with all of the conclusions of the Magistrate, it cannot be said that the Magistrate was biased or prejudiced. One of the most strenuously argued contentions of counsel for the bank in support of its claim that the Magistrate was biased concerns the termination by the Magistrate of the cross-examination of defendant's witness Silver. The record reveals that a substantial portion of the direct examination of the witness Silver was voir dire by plaintiff's counsel and in effect was cross-examination. Also, the termination time for cross-examination was consistent with the previous representation of plaintiff's counsel as to when he would conclude the cross-examination. Even if the bank's attorneys should have been allowed additional cross-examination of witness Silver, the rulings made herein have cured any prejudice that might have occurred by lack of further cross-examination of that witness.

When the reference to the Magistrate was initially made, the record reveals that the Magistrate initially contemplated that his role was merely to find what the landlord's claims for escalation rent were and what the specific objections to each item were. However, as the proceedings progressed, the record reveals that the Magistrate and the attorneys contemplated that the reference was for the Magistrate to determine if the bank had established its claim as to an item of direct operating cost and if so, the amount thereof and whether the objections were valid. While the arguments before the Magistrate indicate on the part of the landlord's counsel a confusion of understanding as to the landlord's burden, nevertheless, this Court is of the opinion that it was the landlord's burden to prove that an item claimed was first, a direct operating cost and secondly, if so, the amount thereof. It is on that basis that this Court has reviewed the record and made the rulings herein.

In order that final judgment may be entered in accordance with this opinion, the landlord's attorneys are directed to file within ten (10) days from date hereof an adjusted claim in accordance with the findings and rulings herein.

## ON MOTIONS FOR RECONSIDERATION AND FOR CLARIFICATION

On March 1, 1982, this Court entered its memorandum opinion on the numerous objections made to the Magistrate's Report and Recommendation previously filed in the above-styled case. After reviewing the entire record, the Court made extensive findings on defendant's claim of rent escalation, accepting in part and rejecting in part the findings of the Magistrate. Thereafter, defendant filed a motion for reconsideration and rehearing on March 10, 1982, and on March 16, 1982, plaintiff filed a motion for clarification of the Court's prior opinion.

The motions were later heard by this Court on March 19, 1982. Additional hearings were held on April 29, 1982 and May 20, 1982 concerning the validity of adjustment # 8 (reduction of electrical costs in the amount of $16,180.00 in 1968).

At the conclusion of the April 29, 1982 hearing, the Court modified its previous opinion in the following manner: 1) the court found that the Magruder Garage and the open air parking spaces were included in the lease's definition of "new office building" and, therefore, were proper direct operating expenses for the "new office building" and subject to be included in the rent escalation calculation for that building only; 2) the court found that defendant's adjusted claim for electrical repairs in 1969 of $5497.00 should be further reduced by $2873.00, reflecting the balance of electrical repairs that were actually for electrical work in specific tenant's suites and, therefore, not proper direct operating costs.[1] In all other respects, the Court's March 1, 1982 opinion was left unchanged.

The only issue remaining to be resolved at this time is the validity of adjustment # 8. The Court noted at the conclusion of the May 20, 1982 hearing that the evidence presented supports a finding that additional electrical costs were incurred in 1968 as a result of the completion of construction in the new office building. Upon consideration of all the evidence presented, and following an examination of the electrical costs incurred in the immediately succeeding years, the Court finds that an adjustment in the amount of $15,060 is proper. All other issues having previously been decided by this Court, it is

ORDERED that this Court's memorandum opinion entered March 1, 1982 be and is hereby modified as follows:

1. The Magruder Garage and the open air parking spaces are properly includable as direct operating costs for the "new office building" and, therefore, subject to inclusion in defendant's rent escalation calculation for the new building only.

---

1. The resulting adjusted total of $2624.00 reflects the cost of electrical repairs in 1969 that is a proper direct operating cost subject to inclusion in defendant's rent escalation calculation.

932

2. Defendant's adjusted claim for electrical repairs in 1969 is hereby reduced an additional $2873.00, leaving a final adjusted total for electrical repairs in the amount of $2624.00.

3. Defendant's adjustment # 8 to the electrical charges for light and power in 1968 is reduced to $15,060.00. The adjusted total 1968 light and power charge is found to be $31,722.00; it is further

ORDERED that all remaining objections to the Court's March 1, 1982 opinion are rejected as without merit; and, it is further

ORDERED that the landlord's attorneys shall file with the Court, within thirty (30) days from date hereof, an adjusted claim in accordance with the findings and rulings herein.